*State of Maryland v. Terrell Henry Fields,* No. 784, September Term, 2022. Opinion by Graeff J.

**SECOND AMENDMENT – AGE-BASED RESTRICTIONS ON FIREARM POSSESSION – SEVERABILITY**

The circuit erred in dismissing the charges against appellant on the ground that the statutes involved violated the Second Amendment of the United States Constitution. To assess a challenge to a gun regulation, we look to the two-part test set forth in *New York State Rifle and Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022). First, we determine whether the Second Amendment covers appellee's conduct. Second, if that is the case, we determine if the statute is consistent with this Nation's historical traditions of firearm regulation.

Md. Code Ann., Pub. Safety ("PS") § 5-133(d) (2022 Repl. Vol.) prohibits possession of a regulated firearm by those under 21 years of age. With regard to the first step of the analysis, we assume, without deciding, that individuals under the age of 21 are part of "the people" that the Second Amendment protects. With respect to the second step, we hold that the statute is constitutional as applied to individuals who are 18-to-20-years of age because it is consistent with the Nation's historical tradition of firearm regulation.

Md. Code Ann., Crim. Law ("CR") § 4-203 (2021 Repl. Vol.) prohibits a person from wearing, carrying, or transporting a handgun without a permit. Appellant contends that this statute was unconstitutional because it hinged on an unconstitutional licensing scheme that was in effect at the time of his arrest in 2019. Appellant is correct that the language in PS § 5-306(a)(6)(ii) in effect in 2019 required an applicant for a permit to have a "good and substantial reason to wear, carry, or transport a handgun," and this requirement was found to be unconstitutional in *Bruen*. Nevertheless, that language was severable from the rest of the permitting scheme, leaving in place a scheme that made appellee's conduct criminal. Appellee failed to show that CR § 4-203, with the offending portion severed, was unconstitutional.

The circuit court erred in granting the motion to dismiss the counts charging violations of CR § 4-203.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 784

September Term, 2022

_____

STATE OF MARYLAND

v.

TERRELL HENRY FIELDS

_____

Graeff,
Tang,
Beachley, Donald E.
    (Senior Judge, Specially Assigned),


JJ.
_____

Opinion by Graeff, J.
_____

Filed: July 2, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Terrell Henry Fields, appellee, was charged with multiple offenses, three of which related to a loaded .40 caliber handgun the police found in appellee's vehicle. At the time, appellee was 20 years old, and he did not possess, nor had he ever applied for, a permit to carry a handgun. Appellee filed a motion to dismiss based on *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The Circuit Court for Prince George's County granted the motion and dismissed the charges against appellee.

On appeal, the State presents the following question for this Court's review:

> Did the circuit court err in dismissing appellee's charges on Second Amendment grounds?

For the reasons set forth below, we shall reverse the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 29, 2019, detectives from the Prince George's County Police Department executed a traffic stop of a vehicle driven by appellee. They observed him "reach with both hands and recover an item from his waistband area," which he then placed underneath the driver's seat. The officers then saw, in plain view in the center console, a bag containing what the officers suspected to be marijuana. During a subsequent search of the vehicle, the officers found a .40 caliber semi-automatic Smith and Wesson handgun with an extended magazine. The handgun was loaded with one round in the chamber and nineteen rounds in the magazine. At the time of his arrest, appellee was 20 years old. He did not have a permit for the handgun, nor had he attempted to apply for one.

On October 3, 2019, a Grand Jury indicted appellee on six counts, including: (1) possession of a firearm in connection with a drug trafficking crime in violation of Md.

Code. Ann., Crim. Law ("CR") § 5-621(b)(1) (2021 Repl. Vol.); (2) transportation of a firearm in connection to a drug trafficking crime in violation of CR § 5-621(b)(2); (3) knowing transportation of a loaded handgun in a vehicle in violation of CR § 4-203(a)(1)(v); (4) knowing transportation of a handgun in a vehicle in violation of CR § 4-203; (5) unlawful possession of a controlled dangerous substance in sufficient quantity to indicate an intent to distribute in violation of CR § 5-602; and (6) possession of a regulated firearm while under the age of 21 in violation of Md. Code Ann., Pub. Safety ("PS") § 5-133(d) (2022 Repl. Vol.). The State ultimately *nolle prossed* the three drug-related counts from the indictment and proceeded only on the three remaining firearms violations.[1]

Between December 13, 2019, and June 6, 2022, the court continued the case several times. There were various reasons for the continuances, including the COVID-19 pandemic.

On June 24, 2022, appellee filed a motion to dismiss, arguing that *Bruen*, 597 U.S. 1, which was decided one day earlier, invalidated Maryland's firearm permitting scheme, which required, pursuant to PS § 5-306(a)(6)(ii), that an applicant have "good and substantial reason to wear, carry, or transport a handgun." Appellee's motion to dismiss noted that *Bruen* invalidated this type of "may issue" permitting scheme, which required the applicant to demonstrate a "special need for self-defense." Appellee argued, therefore,

---

[1] A *nolle prosequi* is "an official declaration by the State, announcing that it will not pursue the charges in a particular charging document." *State v. Simms*, 456 Md. 551, 557 (2017) (quoting *Gilmer v. State*, 389 Md. 656, 659 n.2 (2005)). The Supreme Court of Maryland has described it as "[t]he abandonment of the prosecution." *Id.* (quoting *Barrett v. State*, 155 Md. 636, 638 (1928)).

that the charges against him should be dismissed. He argued that he had standing to challenge PS § 5-306(a)(6)(ii), even though he failed to apply for a carry permit, because the statute itself violated the Second Amendment under the *Bruen* test, and therefore, he was being prosecuted under an unconstitutional statute.

On June 27, 2022, the court held a hearing on appellee's motion to dismiss. Appellee's counsel argued that CR § 4-203 "incorporates the permitting regime of [PS 5-306(a)(6)(ii)]," which *Bruen* identified as an impermissible "may issue" permitting scheme. Counsel acknowledged that *Bruen* was not a criminal case, but he stated that it did not matter because "the State cannot enforce a prohibition that violates the Second Amendment." Counsel argued that appellee had "standing to challenge the constitutionality of a regulation he's being prosecuted for violating."

Counsel then addressed the constitutionality of PS § 5-133(d), prohibiting the possession of a regulated firearm by a person under the age of 21.[2] He argued that PS § 5-133(d) is unconstitutional under *Bruen* and the Second Amendment, asserting that persons who are under the age of 21 "are part of the people whom the Second Amendment protects." Counsel stated that, at the time of the founding, people as young as 16 were part of the militia, and the State would have to show a historical tradition for a ban on firearm possession for individuals between 18 and 20.

---

[2] Counsel stated that he had not challenged count six, which charged appellee with possession of a regulated firearm while under 21 years of age in violation of Md. Code Ann., Pub. Safety ("PS") § 5-133(d) (2022 Repl. Vol.), in his written motion because he believed that the State had *nolle prossed* that charge.

The State argued that, although *Bruen* invalidated "may issue" permit schemes, the Court did not hold that gun permitting schemes in general were unconstitutional, and only one line, the good and substantial cause language, needed to be stricken with regard to Maryland handgun permits. The rest of the statutory scheme, including the age restriction, was constitutional. The State also argued that appellee lacked standing to challenge the scheme because there was no evidence that he attempted to apply for a gun license.

The court granted appellee's motion to dismiss the charges. It characterized the *Bruen* opinion as "fairly Draconian and myopic," stating that "[w]hat was contemplated during colonial times simply could not be envisioned to encompass the breadth and depth of society 300 years later." Nevertheless, based on the court's interpretation of *Bruen*, it granted the motion to dismiss.

On June 30, 2022, the State filed its Notice of Appeal.[3] On January 9, 2023, the parties filed a joint motion to stay briefing, stating that the Maryland Supreme Court's forthcoming decision in *Fooks v. State*, 490 Md. 458 (2025), *cert. denied*, 2026 WL 490722 (U.S. 2026), would "provide guidance for the appropriate decision in" the case *sub judice*. This Court granted the motion.

---

[3] The State appealed the court's decision to grant the motion to dismiss in accordance with Md. Code. Ann., Cts. & Jud. Proc. ("CJ") § 12-302 (2025 Supp.), which provides that the State may appeal from a final judgment granting a motion to dismiss in a criminal case.

On June 6, 2025, the Supreme Court of Maryland issued its decision in *Fooks*, and on July 2, 2025, this Court lifted the stay. The parties subsequently filed their briefs, and this Court heard argument on February 6, 2026.

**STANDARD OF REVIEW**

We review dismissal rulings based on the interpretation of constitutional, statutory, or case law *de novo. Jackson v. State*, 485 Md. 1, 28 (2023). Moreover, "[t]he proper scope of a constitutional right, and its application to a particular set of facts, are issues of law" which we review *de novo. Pizza di Joey, LLC v. Mayor of Balt.*, 470 Md. 308, 339 (2020).

**DISCUSSION**

The State contends that the circuit court erred in dismissing the charges against appellee. It argues that the court's analysis of the Second Amendment, which protects "the right of the people to keep and bear arms," was wrong for several reasons.

With respect to the dismissal of the count charging a violation of PS § 5-133(d), which generally bars those under age 21 from possessing regulated firearms, the State contends that the statute does not violate the Second Amendment for two reasons. First, it argues that "[t]he founding generation did not understand those under 21 to be part of 'the people' having the right 'to keep and bear arms,'" and therefore, the plain text of the Second Amendment did not apply to appellee's handgun possession. Second, the State asserts that "restrictions on firearm possession by those under 21 are consistent with a historical tradition of age-related restrictions on firearms access."

5

The State also alleges error by the court in dismissing the counts charging violations of CR § 4-203, which prohibits the transportation of a loaded handgun in a vehicle on public roads, subject to exceptions, which included possession with a permit. The State acknowledges that in 2019, when appellee was arrested, an applicant had to show a "good and substantial reason" ("GSR") to wear, carry, or transport a handgun, and that *Bruen* held this requirement unconstitutional. It argues, however, that dismissal of the charges was erroneous because: (1) appellee lacked standing to challenge the permit scheme because he offered no evidence that he applied for a permit or that an application would have been futile, and (2) the GSR requirement could be severed, leaving a constitutional permitting scheme in Maryland.

Appellee contends that the court correctly granted his motion to dismiss the gun charges. He argues that PS § 5-133(d)(1) is facially unconstitutional and unconstitutional as applied to him, asserting that individuals under the age of 21 are part of "the people" who enjoy protections under the First and Fourth Amendments, and that same analysis applies to the Second Amendment. Appellee argues that the law restricting individuals under 21 from possessing handguns is inconsistent with the "nation's tradition of firearm regulation," and therefore, PS § 5-133(d)(1) is unconstitutional. With respect to CR § 4-203, appellee contends that, at the time of his arrest, CR § 4-203 was facially unconstitutional because it contained the "may-issue" licensing scheme that *Bruen* determined was unconstitutional.

Before addressing the issues raised by the parties, we address the substantial change in the law regarding gun possession that has occurred during the course of the last 20 years.

## I.

### Second Amendment Legal Background

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court of the United States stated that it was engaging in the "first in-depth examination of the Second Amendment," and it concluded that the Second Amendment guarantees an individual right to keep and possess arms in the home for self-defense. The Court clarified, however, that the right provided by the Second Amendment was not unlimited, and it was "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Court made clear that its ruling did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. This list did "not purport to be exhaustive." *Id.* at 627 n. 26.

Two years later, the Court held "that the Second Amendment right is fully applicable to the states" under the Due Process Clause of the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). The Court stated that the Second

7

Amendment "guarantee is fully binding on the States and thus *limits* (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values." *Id.* at 785.

In 2022, the Supreme Court issued another groundbreaking decision. In *Bruen*, 597 U.S. at 10, the Court held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." This Court recently summarized the holding in *Bruen*, as follows:

> The case arose from a challenge to the constitutionality of New York's licensing regime, which made it a crime to possess any firearm without a license, and provided that, to obtain a license to carry a concealed gun, the applicant must show "proper cause." *Id.* at 11. The "proper cause" requirement had been interpreted to require an applicant to "demonstrate a special need for self-protection distinguishable from that of the community." [*Bruen*, 597 U.S. at 12].
>
> The Court stated that, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 24. The Court held that the plain text of the Second Amendment, which provides that "the right of the people to keep and bear Arms, shall not be infringed," protects an individual's right to carry handguns publicly for self-defense. *Id.* at 32–33. Based on that plain language, the government had the burden to justify any regulation on handguns by showing that it was "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 33–34. The Court acknowledged that "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 38. It concluded, however, that the "historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" or "limiting public carry only to those law-abiding citizens who

> demonstrate a special need for self-defense." *Id.* at 38. Accordingly, the Court held that New York's proper cause licensing requirement was unconstitutional. *Id.*

*Hicks v. State*, ___ Md. App. ___, ___, 2026 WL 1601794, at *6 (2026).

The Court distinguished "may issue" permitting schemes from "shall issue" schemes, explaining that a "shall issue" regime required authorities to issue concealed-carry licenses "whenever applicants satisfy certain threshold requirements." *Bruen*, 597 U.S. at 13. States with "shall issue" schemes did not grant "licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Id.* at 13. "May issue" regimes, by contrast, which in 2022 included six states, including Maryland and New York, required an applicant to make a special showing of need to carry a firearm in public and gave authorities "discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." *Id.* at 13–15. As indicated, the Court held that New York's "may-issue" permitting scheme requiring a showing of proper cause was unconstitutional. *Id.* at 38–39.

In a concurring opinion, Justice Alito stated that *Bruen* "decide[d] nothing about who may lawfully possess a firearm," and it did not "expand the categories of people who may lawfully possess a gun." *Id.* at 73 (Alito, J. concurring). Justice Kavanaugh wrote a separate opinion for himself and Chief Justice Roberts, noting that the *Bruen* opinion did "not prohibit States from imposing licensing requirements for carrying a handgun for self-

9

defense," and he stated that the "Second Amendment allows a 'variety' of gun regulations." *Id.* at 79–80 (Kavanaugh, J. concurring).

Prior to *Bruen*, Maryland had a "may-issue" licensing regime that required applicants for a permit to demonstrate a "good and substantial reason" to possess a handgun, interpreted to mean that an applicant "must demonstrate having received actual threats or assaults" to qualify for a permit. *In re Rounds*, 255 Md. App. 205, 210–11 (2022) (quoting PS § 5-306(a)(6)(ii)). After *Bruen*, this Court held that the "good and substantial reason" requirement of PS § 5-306(a)(6)(ii) was unconstitutional. *Id.* at 212. *Accord Engage Armament LLC v. Montgomery Cnty.*, ___ Md. ___, ___, 2026 WL 1144313, at *14 (2026). The legislature responded to these decisions as follows:

> In 2023, the General Assembly amended PS § 5-306 to remove the "good and substantial reason" requirement, effective October 1, 2023. 2023 Md. Laws Ch. 651. Maryland is now a "shall issue" state, and its citizens are authorized to obtain a concealed carry permit provided that they are 21 years of age or a member of the uniformed services, do not have any disqualifying offenses or mental disorders, do not have a substance abuse disorder, have successfully completed a firearms training course, and "based on an investigation . . . ha[ve] not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another." PS § 5-306(a). Applicants must also show that they are "not otherwise prohibited by State or federal law from purchasing or possessing a handgun." *Id.* § 5-306(a)(10)(ii).

*Hicks*, ___ Md. App. at ___, 2026 WL 1601794, at *7 (footnotes omitted).

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Court clarified *Bruen's* analysis, "which lower courts had struggled to apply." *Fooks*, 490 Md. at 463. In that case,

10

the Court rejected a facial challenge to a federal statute barring a person "subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that [the person] 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." *Rahimi*, 602 U.S. at 684 (quoting 18 U.S.C. § 922(g)(8)). The Court explained that *Bruen's* "analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. The law need not, however, be a "dead ringer" or a "historical twin." *Id.* The reviewing "court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29). *Rahimi*, therefore, clarified that the "Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 691–92. The Second Amendment does not prohibit "the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 698.

In *Fooks*, 490 Md. at 465, the Supreme Court of Maryland applied *Bruen* and *Rahimi* to PS § 5-133(b)(2), which prohibits the possession of regulated firearms by those who have "been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years." The Court held that PS § 5-133(b)(2) was the equivalent of a prohibition on the possession of firearms by felons, which the United States

Supreme Court had repeatedly identified as a permissible limitation on the Second Amendment right and presumptively constitutional. *Id.* at 489–98.

The Court additionally held that "felon dispossession laws like § 5-133(b)(2) are consistent with our Nation's historical tradition of firearm regulation." *Id.* at 498. The Court noted that, when the Second Amendment was ratified, "the right to keep and bear arms was not viewed as inconsistent with the prohibition on the possession of firearms by categories of individuals thought to present a special danger unrelated to whether they had previously engaged in or demonstrated a propensity for violence." *Id.* at 499. The Court also considered evidence that English and early American legislatures disarmed distrusted groups "for reasons other than demonstrated dangerousness." *Id.* at 499-501. The Court agreed with other courts that found a historical tradition of prohibiting firearm ownership by categories of individuals who were perceived to present "an unacceptable risk of danger if armed." *Id.* at 504-05 (quoting *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024)). The Court found that PS § 5-133(b)(2) satisfied the Second Amendment and was constitutional on its face and as applied to Fooks. *Id.* at 510.

In *United States v. Hemani*, ___, U.S. ___, ___, 2026 WL 1751710 at *12 (June 18, 2026), the Supreme Court of the United Stated held that the prosecution of Mr. Hemani for possession of a firearm while he was  an unlawful user of a controlled dangerous substance i.e., use of marijuana a few times a week, was not consistent with the Second Amendment. The Court stated that "[t]he Second Amendment protects the right of 'all Americans' to keep and bear firearms for self-defense." *Id.* at *4 (quoting *Heller*, 554 U.S. at 581). In

12

assessing whether the law banning possession of a gun by an unlawful user of a controlled substance was consistent with the Nation's tradition of firearm regulation, the government relied on historical habitual drunkard laws, which the government asserted restricted the liberties of individuals to protect the public from dangerous people. *Id.* at *5–6. The Court rejected this argument, stating that those laws "targeted different kinds of people and did so for different reasons, and operated in different ways." *Id.* at 12. For example, habitual drunkard laws focused on those whose "drinking rendered them practically incapacitated and incapable of managing their affairs," and not, as the statute at issue did, on those who merely used controlled dangerous substances. *Id.* at *7.

Moreover, those historical laws "usually provided some form of process before an individual lost any of his liberties," whereas the statute at issue "automatically divests an individual of his constitutional right to bear arms the moment he becomes an unlawful user . . . without any pre-deprivation process" *Id.* at *2. Accordingly, the Court held that the government had not carried its "burden of showing its prosecution of Mr. Hemani complies with the Second Amendment." *Id.* at *12.[4]

With that background in mind, we turn to the issues presented here.

---

[4] Justice Jackson wrote a concurrence, joined by Justice Sotomayor, expressing the belief that the Court "veered off course in *Bruen*" by adopting a "history and tradition" metric to assess the constitutionality of firearm regulations, as opposed to the "means-end scrutiny" approach. *United States v. Hemani*, ___, U.S. ___, ___, 2026 WL 1751710 at *15-16. Although the parties in that case did not ask the Court to overturn *Bruen*, Justice Jackson stated that, in a future case, the Court "should consider whether to retire the failed *Bruen* experiment and return to an explicit assessment of Congress's ends and means when deciding the constitutionality of firearm restrictions." *Id.* at *17.

## II.

## Constitutional Challenge Here

Appellee argues that PS § 5-133 and CR § 4-203 are facially unconstitutional and unconstitutional as applied to him. We begin by discussing the differences between these challenges. In *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 225–26 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1049 (2025), the Fourth Circuit Court of Appeals explained that:

> Plaintiffs contesting the validity of a firearms law under the Second Amendment may bring either an "as-applied" or a "facial" challenge to the law. [*United States v.*] *Moore*, 666 F.3d [313,] at 317–20 [(4th Cir, 2012)]. In an as-applied challenge, the court focuses on the circumstances of the particular plaintiffs and whether, in light of those circumstances, the challenged law was unconstitutionally applied to *those* plaintiffs. *Id.* at 319.
>
> By contrast, in a facial constitutional challenge a plaintiff asks the court to declare that the statute is invalid. As the Supreme Court has explained, "facial challenges are 'disfavored' because they 'often rest on speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi*, 111 F.4th at 452 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)). So to succeed in a facial constitutional challenge, a plaintiff confronts a much more difficult task, namely, to establish that there is "no set of circumstances" under which the law would be valid. *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)); *see also Moore*, 666 F.3d at 318–19 ("[T]he Supreme Court has long declared that a statute cannot be held unconstitutional if it has constitutional application."). "The stakes are higher in a facial challenge, so the bar goes up as well." *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024).

*Accord Motor Vehicle Admin. v. Seenath*, 448 Md. 145, 181 (2016) ("An as-applied challenge is 'a claim that a statute is unconstitutional on the facts of a particular case or in its application to a particular party.'") (footnote omitted) (quoting As–Applied Challenge, Black's Law Dictionary 278 (10th ed. 2014)). Labeling a constitutional challenge as facial or as applied, however, "is not what matters." *Doe v. Reed*, 561 U.S. 186, 194 (2010). Rather, the important point is whether the challenger's claim and the following relief would "reach beyond the particular circumstances" of the particular case. *Id.*

In this case, as indicated, appellee challenges two statutes. With respect to PS § 5-133, appellee presents on appeal an argument regarding all persons under 21, including those under 18. Below, however, the argument was limited to individuals between the ages of 18 and 20. Accordingly, we limit our analysis to the claim that the law is unconstitutional as applied only to individuals between ages of 18 and 20. *See* Md. Rule 8-131(a) ("[A]n appellate court will not decide any [issue other than subject matter jurisdiction] unless it plainly appears by the record to have been raised in or decided by the trial court."); s*ee also NRA v. Bondi*, 133 F.4th 1108, 1130 (11th Cir. 2025) (*en banc*), *cert. pending*, No. 24-1185 (U.S. 2025) (rejecting a facial challenge to the law when the challenge was an as applied challenge to individuals between the ages of 18 and 20). With respect to CR § 4-203, we will address appellee's argument that the statute is facially unconstitutional and unconstitutional as applied to him.

### III.

### Charge Pursuant to PS § 5-133(a)(1)

PS § 5-133 provides that a person may not possess a regulated firearm under certain circumstances.[5] Here, the circumstance at issue restricting possession is age. PS § 5-133(d) provides that, subject to enumerated exceptions, "a person who is under the age of 21 years may not possess a regulated firearm." Appellee, who was 20 years old at the time of his

---

[5] PS § 5-133(b) prohibits possession of a regulated firearm if the person: (1) has been convicted of a disqualifying crime; (2) has been convicted of a common law crime and received a term of imprisonment of more than 2 years; (3) is a fugitive from justice; (4) is an alcoholic; (5) is addicted to or a habitual user of a controlled dangerous substance; (6) suffers from a defined mental disorder and has a history of violence; (7) has been found incompetent to stand trial; (8) has been found not criminally responsible under § 3-110 of the Criminal Procedure Article; (9) has been voluntarily admitted for more than 30 consecutive days to a facility defined by § 10-101 of the Health--General Article; (10) has been involuntarily committed to a facility as defined in § 10-101 of the Health--General Article; (11) is under the protection of a guardian appointed by a court under § 13-201(c) or § 13-705 of the Estates and Trusts Article, except for cases in which the appointment of a guardian is solely a result of a physical disability; (12) is a respondent against whom a current non ex parte civil protective order has been entered or an order for protection has been issued by a court of another state or a Native American tribe and is in effect; and (13) if under the age of 30 years at the time of possession, has been adjudicated delinquent by a juvenile court for an act that would be a disqualifying crime if committed by an adult.

16

arrest, does not contend that any of the enumerated exceptions apply to his possession of the gun.[6]

As indicated, appellee contends that PS § 5-133(d)(1) is unconstitutional. He asserts that "the text of the Second Amendment protects the right of individuals under 21 to bear arms," and "[t]he Founding Era did not impose a relevantly similar burden on the Second Amendment rights of individuals under 21" as Maryland's statute.

To assess this claim, we look to the two-part test *Bruen* established for constitutional challenges to gun regulations. First, we must determine whether the Second Amendment covers appellee's conduct. *Bruen*, 597 U.S. at 17. Second, if that is the case, we must determine if the statute is "consistent with this Nation's historical traditions of firearm regulation." *Id.*

## A.

### Plain Text of the Second Amendment

The first step in the analysis under *Bruen* is whether the plain text of the Second Amendment covers appellee's conduct. In *Bruen*, the Court found that the petitioners, "two

---

[6] Exceptions to the prohibition against a person under 21 possessing a handgun include: (1) temporary transfer to a person who is supervised and acting with the permission of a parent or guardian; (2) transfer by inheritance of title, and not of possession; (3) possession by a member of the armed forces or National Guard while performing official duties; (4) temporary transfer to a person participating in marksmanship training of a recognized organization and under the supervision of a qualified instructor; (5) possession by a person required to possess a regulated firearm for employment and who holds a permit; or (6) the possession a firearm for self-defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest. PS § 5-133.

17

ordinary, law-abiding, adult citizens," were "part of 'the people,' whom the Second Amendment protects," and their conduct, carrying handguns publicly for self-defense, was covered by the plain text of the Second Amendment. 597 U.S. at 31–32.

The question here is whether appellee, who was 20 years old at the time of his arrest, was part of "the people" that the Second Amendment protects. *Id.* at 24. If so, "the Constitution presumptively protects" his conduct. *Id.*

The parties disagree regarding whether appellee's challenge satisfies this first step. The State argues that, during the Founding-era, individuals under the age of 21 "were not understood to be part of 'the people'" protected by the Second Amendment. Rather, it asserts that, at the time of the founding, individuals under the age of 21 were legally minors who were viewed as lacking reason and judgment and "lacked the full rights of adult citizens." Since minors did not enjoy rights independent of their parents, the State argues that "the founding era would not have understood the Second Amendment right to reach those under 21."

Appellee contends that individuals under 21 are part of "the people" covered by the Second Amendment. He notes that the same term, "the people," is used in both the First and Fourth Amendments, which apply to individuals under the age of 21, including those under 18. He argues, therefore, that the term "the people" in the Second Amendment must include individuals under 21.

Other courts have addressed this issue, and we find those cases instructive. In *Lara v. Comm'r. Pa. State Police*, 125 F.4th 428, 436–39 (3rd Cir.), *cert. pending*, No. 24-1329

18

(U.S. 2025), the court rejected the argument that 18-to-20-year-olds are not among "the people" protected by the Second Amendment. It stated that there was a strong presumption that the Second Amendment applies to "all Americans." *Id.* at 435 (quoting *Heller*, 554 U.S. at 581). Although 18-to-20-year-olds were considered minors at the founding, the court stated that, at step one, in determining whether the Second Amendment's plain text covers an individual's conduct, the court was not "rigidly limited by eighteenth-century conceptual boundaries," noting that such an approach would result in a finding that "the people" consisted solely of property-owning white males, which "is obviously not the state of the law." *Id.* at 437. The court stated that an individual could be included as a member of "the people" and still not be allowed to carry a gun, noting that "[n]either felons nor the mentally ill are categorically excluded from our national community," but that did not mean that the government cannot prevent them from possessing guns. *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019)). *Accord Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583, 592–95 (5th Cir. 2025) (the "Second Amendment 'belongs to *all* Americans,'" and 18-to-20-year-olds were part of "the people" for Second Amendment purposes); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 114–16 (10th Cir. 2024) ("the people" as defined in the Second Amendment includes people 18 to 20 years of age); *Worth v. Jacobson,* 108 F.4th 677, 688–92 (8th Cir. 2024) (law-abiding 18-to-20-year-old individuals are members of "the people" under the Second Amendment), *cert. denied*, 145 S. Ct. 1924 (2025); *State v. Glover*, ___ A.3d ___, ___, 2026 WL 771472, at *7 (N.J. Super. Ct. App. Div. Mar. 19, 2026) ("[P]eople between the ages of eighteen

19

and twenty are included in 'the people' protected by the Second and Fourteenth Amendments.").

These cases are persuasive, but we need not definitely decide this issue. Rather, we will take the approach adopted by other circuits of the United States Courts of Appeal and "assume without deciding that [individuals under 21] are part of 'the people' and are therefore covered by the [Second] Amendment's text." *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 575 (4th Cir. 2025), *cert pending*, No. 25–24 (U.S. 2025). *Accord Bondi*, 133 F.4th at 1130 ("[W]e assume, but do not decide, that individuals under the age of 21 are part of 'the people' protected by the Second Amendment."); *Picon v. United States*, 343 A.3d 57, 63 (D.C.) (assuming, without deciding, that 18-to-20-year-olds with no criminal history are part of "the people" the Second Amendment protects), *cert. pending*, No. 25-5713 (U.S. 2025).

We thus turn to address whether Maryland's regulation of the right of those 18 to 20 years old to possess firearms passes the second step of the *Bruen* analysis.

**B.**

**Historical Tradition**

Once there is a showing that a defendant's conduct is entitled to protection under the Second Amendment, the government bears the burden to show that the challenged regulation "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 34. "If the regulation is consistent with the Nation's historical tradition

20

of firearm regulation, it does not infringe the right of the people. If not, then the regulation improperly infringes the individual right to keep and bear arms." *Worth*, 108 F.4th at 688.

In addressing the legality of PS § 5-133(d), which restricts possession of a firearm by those under 21, we must determine whether it is consistent with the historical tradition of firearm regulation to ban public carrying of handguns based on age. The State is not required to provide a "historical twin," it need only produce evidence of "similar restrictions" that are "analogous" to the contemporary regulation. *Rahimi*, 602 U.S. at 692.

In assessing whether a regulation is consistent with historical principles, the inquiry turns on "[w]hy and how the regulation burdens the right" to bear arms. *Id.* If a regulation addresses the same problem as historical restrictions, it shares the same "why" as the historical restrictions. *Id.* If a regulation shares a "why" with historical restrictions, "it is lawful if it is 'similar' to those restrictions in 'how' it burdens the right." *Bondi*, 133 F.4th at 1114 (quoting *Rahimi*, 602 U.S. at 692)).

To determine whether PS § 5-133(d) is consistent with historical tradition, we need to first decide the period of history against which firearms regulations should be compared. The United States Supreme Court has not expressly decided this issue. The Court stated that it "generally assumed that the scope" of the protection in the Bill of Rights "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. Nevertheless, it recognized the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Id.* The

21

Court stated in *Bruen* that it "need not address this issue" because "public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38. *Accord Rahimi*, 602 U.S. at 692 n. 1 (determining whether the time to gauge the scope of the Second Amendment was 1791 or 1865 was unnecessary in that case).

Courts addressing this issue with respect to laws restricting possession of firearms for minors similarly have looked to both time periods. *See Picon*, 343 A.3d at 66 (the law of both the Founding-era and the Reconstruction-era "restricted firearm possession by individuals under twenty-one"); *Bondi*, 133 F.4th at 1117 ("both eras restricted the purchase of firearms by minors"). Even courts that have looked primarily at sources from the Founding-era to interpret the Second Amendment have recognized that a public understanding of the Second Amendment when the Bill of Rights was adopted in 1791 is not limited to restrictions in effect at that time. *See Lara*, 125 F.4th at 436–39. Laws enacted in the late nineteenth century, around the time of the adoption of the Fourteenth Amendment, can "confirm a court's understanding of Founding-era public meaning." *Id.* at 441. *Accord McCoy*, 140 F.4th at 578 (laws enacted in the later nineteenth century can confirm the meaning of the Second Amendment when "consistent with founding-era history").

In addressing whether the prohibition on possession or purchase of firearms by 18-to-20-year-olds is sufficiently analogous to this Nation's historical tradition of firearms regulation, we note that courts in other jurisdictions have reached differing conclusions.

22

In *Lara*, 125 F.4th at 443–45, the court held that a Pennsylvania law that prohibited 18-to-20-year-old individuals from carrying firearms outside the home during a state of emergency violated the Second Amendment, noting that, at the time of the Second Amendment's ratification, the Second Militia Act "required all able-boded, men to enroll in the militia and arm themselves upon turning 18." The court stated that this indicated that "founding-era law makers believed those youth could, and indeed should, keep and bear arms." *Id.* at 444. The court held that Pennsylvania did not meet its burden of proving that its statute, which restricted the Second Amendment rights of individuals aged 18 to 20, was "consistent with the principles that underpin founding-era firearm regulations." *Id.* at 445.

Similarly, in *Reese*, 127 F.4th at 600 (5th Cir. 2025), the Fifth Circuit of the United States Court of Appeals held that a federal statute prohibiting the sale of handguns to 18-to-20-year-olds was "unconstitutional in light of our Nation's historic tradition of firearm regulation." The court pointed to the 1792 Militia Act and held that the government failed to "overcome this clear and germane evidence that eighteen-to-twenty-year-olds enjoyed the same Second Amendment rights as their twenty-one-year-old peers at the founding." *Id.* at 596. *Accord Worth v. Jacobson*, 108 F.4th 677, 698 (8th Cir. 2024) (Minnesota did not meet its burden to show a historical analogue to its restriction on obtaining a permit to carry a handgun for those under 21).

Other courts, however, have upheld age restrictions under the second step of *Bruen*, finding that such restrictions are consistent with the Nation's historical tradition of firearm regulation.  For example, in *Bondi*, 133 F.4th at 1122, the United States Court of Appeals

23

for the Eleventh Circuit held that a Florida law prohibiting the sale of firearms to individuals under 21 was "consistent with our regulatory tradition in why and how it burdens the right of minors to keep and bear arms." Similarly, in *McCoy*, 140 F.4th at 575, the United States Court of Appeals for the Fourth Circuit held that a federal statute prohibiting commercial sale of handguns to individuals under 21 was "relevantly similar to the burden imposed by the founding-era rule that contracts with individuals under the age of 21 were unenforceable." The court stated that the statute regulated only transactions involving firearms, and it did not prohibit anyone from owning, possessing, or using firearms. *Id.* at 572.

To be sure, these last two cases addressed restrictions on the sale of firearms to individuals under the age of 21, not possession of firearms. Other courts, however, have upheld restrictions on the ability of those under 21 to possess and carry firearms. *In Picon*, 343 A.3d at 65, the court held that there were no constitutional problems with the District of Columbia's firearm registration and licensing statutes, noting that history revealed "a regulatory tradition of restricting access to firearms based on age for those considered to lack the judgment and discretion to use them safely." The court stated that restrictions on the ability to purchase firearms "necessarily implicates their ability to possess and carry them." *Id.* It concluded that "restricting the purchase of firearms by individuals under twenty-one is therefore a historical analogue relevantly similar to laws regulating the ability of those under twenty-one to possess or carry firearms." *Id.* at 65–66. *Accord Pennsylvania v. Williams*, 341 A.3d 144, 154 (Pa. Super. Ct. 2025) (state law restricting

24

concealed carry permits to individuals under 21 "is consistent with the nation's historical tradition of firearm regulation"), *cert. granted in part*, 352 A.3d 455 (Pa. 2026); *Glover*, ___ A.3d at ___, 2026 WL 771472, at *8–12 (statute restricting persons under the age of 21 from purchasing or possessing a handgun, except in defined circumstances, was "consistent with our Nation's historical tradition of restricting minors' access to guns for public safety").[7]

Based on our review of this caselaw, we conclude that the burden that PS § 5-133 imposes on the Second Amendment right of 18-to-20-year-olds is consistent with the Nation's historical tradition of firearm regulation. We find particularly persuasive the comprehensive historical analysis set forth by the Eleventh Circuit, sitting *en banc*, in *Bondi*, which we adopt and supplement, as follows.

In *Bondi*, 133 F.4th at 1117, the court noted that, "[a]t the Founding, a person was an 'infant[ ]' or a 'minor[ ]' in the eyes of the law until age 21." (quoting Zephaniah Swift, *A System of the Laws of the State of Connecticut* 213 (1795)). The founding generation believed that minors "lacked the reason and judgment necessary to be trusted with legal rights." *Id.* "Because of their lack of reason, infants were subject to the 'power' of their

---

[7] In *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 119–20 (10th Cir. 2024), the court held that a state law setting 21 as the minimum age for the sale and purchase of guns was "an aged-based condition or qualification on the sale of arms, . . . [that] falls outside of the scope of the Second Amendment's right to 'keep and bear' arms." It based its analysis, however, on *Bruen's* first step, concluding that the statute at issue restricted the "sale and purchase" of guns, which the court found to be a commercial restriction that "presumptively do[es] not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *Id.* at 120.

parents until they reached age 21." *Id.* (quoting 1 William Blackstone, *Commentaries on the Laws of England*, 452-53 (George Sharswood ed., 1893)). Minors lacked capacity to contract or purchase goods. *Id.* at 1117–18. The "inability to contract impeded minors from acquiring firearms during the Founding era" because people often bought goods, including firearms, on credit. *Id.* at 1118. *Accord McCoy*, 140 F.4th at 576 (the inability to contract prevented minors from acquiring firearms during the Founding-era because "[e]ighteenth-century America was a credit economy").[8]

The age of majority remained 21 "from the country's founding well into the twentieth century." *Bondi*, 133 F.4th at 1122 (quoting Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016)). The reduction in the age of majority occurred during World War II, when the war effort "necessitated lowering the conscription age to 18," prompting states to lower the age of majority. *Id.* In 1971, when the Twenty-Sixth Amendment was ratified, individuals were granted the right to vote at age 18. *Id.* For most of the first 200 years of our nation's history, however, the "law limited the rights of individuals under the age of 21, including their purchase of firearms." *Id.*

Although the Founding-era lacked express prohibitions on the possession of firearms, "the limitations on the legal rights of minors were so pervasive that states had no

_____

[8] Even if a minor could secure physical currency to purchase a firearm, "merchants would have been unwilling to sell because they bore the risk that the minor would rescind the transaction and be entitled to a full refund under the infancy contract doctrine." *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 576 (4th Cir. 2025) (citing *Riley v. Mallory*, 33 Conn. 201 (1866) (holding that seller of a firearm was required to give a full refund to a minor who insisted on returning used gun)), *cert. pending*, No. 25-24 (U.S. 2025).

need to enact" such restrictions. *Id.* at 1123–24. Moreover, the post-ratification period, i.e., the "laws from the mid-to-late nineteenth century" made "explicit what was implicit at the Founding: laws may regulate the purchase of firearms by minors." *Id.* at 1124. Beginning in 1856, numerous states, territories, and municipalities "enacted laws criminalizing the sale of firearms, often handguns specifically, to individuals under the age of 21." *McCoy*, 140 F.4th at 578. Handgun ownership was not common in the early nineteenth century, "[b]ut as soon as handguns came on the scene, legislatures quickly prohibited their sale to minors[.]" *Id.* at 579. "In the second half of the nineteenth century, 20 jurisdictions enacted laws that restricted access to arms for minors." *Bondi*, 133 F.4th at 1121.[9] Thus, "[t]he law of the Founding-era, which restricted the purchase of firearms by minors, continued into the nineteenth century in the form of statutory prohibitions. . . . When the common-law regime became less effective at restricting minors' access to firearms, statutes increasingly did the work." *Id.* These laws acted to continue the "national historical tradition . . . of

---

[9] In *NRA v. Bondi*, 133 F.4th 1108, 1121–22 (11th Cir. 2025) (*en banc*), *cert. pending*, No. 24-1185 (U.S. 2025), the United States Court of Appeals of the Eleventh Circuit cited the following statutes: 1855–56 Ala. Laws 17; 16 Del. Laws 716 (1881); 1876 Ga. Laws 112; The Code of the State of Georgia 782 (R. H. Clark, et al. eds., 2d ed. 1873); 1881 Ill. Laws 73; 1875 Ind. Acts 59; 1884 Iowa Acts 86; 1883 Kan. Sess. Laws 159; 1860 Ky. Acts 245; 1890 La. Acts 39; 27 Stat. 116–17 (1892); 1882 Md. Laws 656; Mo. Rev. Stat. § 1274 (1879), *reprinted in* 1 The Revised Statutes of the State of Missouri 1879, at 224 (Jefferson, Carter & Regan 1879); 1878 Miss. Laws 175; 1885 Nev. Stat. 51; 1893 N.C. Sess. Laws 468–69; Tenn. Code § 4864 (1858), *reprinted in* The Code of Tennessee Enacted By the General Assembly of 1857–'8, at 871 (Nashville, E. G. Eastman & Co. 1858); 1897 Tex. Gen. Laws 221–22; 1882 W. Va. Acts 421; 1883 Wis. Sess. Laws 290 (vol. 1).

restricting firearm access to individuals deemed unable to responsibly bear arms, particularly [minors.]" *Williams*, 341 A.3d at 157.

Appellee points to founding-era militia laws as support for his argument that "the historical record demonstrates that persons aged under 21 regularly possessed firearms." The Second Militia Act of 1792 required that all "free[,] able-bodied[,] white male citizen[s] . . . who [are] or shall be of age of eighteen years, and under the age of forty-five years . . . be enrolled in the militia . . . [and] provide himself with a good musket or firelock . . . or with a good rifle." *Williams*, 341 A.3d at 156 (alterations in original) (quoting Second Militia Act of 1792)).

The law requiring service in the militia, however, does not support a tradition of possession of guns by minors for a couple of reasons. Initially, although militia members were required to furnish their own weapons, "an obligation is not the same thing as a right–an individual's duty to do something does not mean they have a corresponding, unassailable right to do that thing." *Id.* "[A]lthough many colonies *permitted* or even *required* minors to own and possess firearms for purposes of militia service, nothing like a *right* for minors to own and possess firearms has existed at any time in this nation's history." *Illinois v. Aguilar*, 2 N.E.3d 321, 329 (Ill. 2013).

Moreover, the disconnect between militia service and a right to bear arms is further shown by state laws enacted to address the problem related to the inability of minors to purchase firearms required for their militia service. *See Picon*, 343 A.3d at 64 (noting that some states exempted individuals under 21 from the firearm requirement, some explicitly

28

required parents to supply firearms for their children's militia service, and others held parents liable for minors' fines for failure to obtain a firearm). As the court in *Bondi* explained, these restrictions show that founding-era minors generally lacked unrestricted access to firearms. *Bondi*, 133 F.4th at 1120. *Accord Picon*, 343 A.3d at 66 ("[T]he Founding-era and Reconstruction-era understandings of the right to keep and bear arms . . . restricted firearm possession by individuals under twenty-one.").

For these reasons, and others set forth in *Bondi*, 133 F.4th at 1117–23, *Picon* 343 A.3d at 63–67, and *Glover*, ___ A.3d at ___, 2026 WL 771472, at *7–12, we conclude that PS § 5-133(d) is consistent with the Nation's regulatory history and tradition with respect to the rights of those 18 to 20 years of age to keep and bear arms. In determining whether a regulation is consistent with historical tradition, the analysis turns on "[w]hy and how" the regulation burdens the Second Amendment right to bear arms. *Rahimi*, 602 U.S. at 692. If the regulation addresses the same problems as the historical restriction, it shares the "why," and if it is similar to those historical restrictions in "how" it burdens the right, that weighs in favor of a finding that the regulation is lawful. *Bondi*, 133 F.4th at 1114.

With respect to the "why," PS § 5-133(a) addresses the same problems as historical regulations restricting access to firearms, i.e., it limits access to individuals under the age of 21 because they lack the judgment and reason required to safely and responsibly purchase and possess firearms. *See Bondi*, 133 F.4th at 1122–23 ("The Florida law has the same 'why' as the Founding-era limitations: individuals under the age of 21 have not reached the age of reason and lack the judgment and discretion to purchase firearms

29

responsibly."); *Picon*, 343 A.3d at 66 ("[T]he District's regulations address the same problems as historical age-based restrictions on firearm access: preventing those deemed to lack reason, maturity, and judgment from obtaining firearms."); *McCoy*, 140 F.4th at 577 (federal statute prohibiting sale of handguns under 21 and the historical infancy doctrine "were motivated by a recognition that individuals under the age of 21 lack good judgment and reason"); *Glover*, ___ A.3d at ___, 2026 WL 771472, at *11 ("guarding against the impulsive behavior of people under the age of twenty-one" by restricting purchase or possession of firearms was "consistent with our Nation's historical tradition of restricting minors' access to guns for public safety"); *Pennsylvania v. Rosario*, 347 A.3d 770, 777 (Pa. Super. Ct. 2025) (statute prohibiting gun license to persons under 21 shared "why" with historical regulations that prevented persons 18 to 20 years of age to possess firearms because they were "judged too dangerous to allow such access").

PS § 5-133(d) is also consistent with historical restrictions in "how" it burdens the right of individuals under 21 to bear and carry arms. As the *Bondi* court explained:

> Founding-era law precluded individuals under the age of 21 from purchasing arms because they lacked cash and the capacity to contract. Access to arms was a matter of parental consent. When Founding-era laws required minors to carry arms for militia service, states required their parents to provide the arms. And universities, standing in for students' parents, imposed significant restrictions on both firearm access and use. Consistent with these Founding-era limitations, states in the nineteenth century expressly prohibited the sale of arms to minors with some exceptions for parents to provide firearms to their children.

*Bondi*, 133 F.4th at 1123.

30

PS § 5-133(d) is similar to, and less restrictive in some ways than, the law at the Founding. It contains exceptions for a person under the age of 21 to temporarily possess a firearm if they are under the supervision of a person who is at least 21 and acting with the permission of a parent or legal guardian. PS § 5-133(d)(2)(i). Similar to Founding-era regulations that allowed minors to possess weapons for militia service, PS § 5-133(d)(2)(v) allows a person who is under 21, but "who is required to possess a regulated firearm for employment," to possess a firearm. The statute also allows a person under 21 to use "a firearm for self-defense or the defense of others against a trespasser into the residence." PS § 5-133(d)(2)(vi).

As indicated, *Bondi* and *McCoy* involved the right to purchase firearms. In *Picon*, 343 A.3d at 65, however, the court explained that "a restriction on the ability of those under twenty-one to purchase firearms necessarily implicates their ability to possess and carry them." This Nation's historical tradition of restricting the purchase of firearms by individuals under 21, therefore, is a "historical analogue relevantly similar to laws regulating the ability of those under twenty-one to possess or carry firearms." *Id.* at 65–66. *See also United States v. Rene E.*, 583 F.3d 8, 15 (1st Cir. 2009) ("There is some evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms," and therefore, a "ban on juvenile possession of handguns is part of a longstanding practice of prohibiting certain classes of individuals from possessing

firearms—those whose possession poses a particular danger to the public."), *cert. denied*, 558 U.S. 1133 (2010).

We conclude that the restriction on gun possession set forth in PS § 5-133(d), prohibiting gun possession by individuals under 21 years of age, is "consistent with the principles that underpin our regulatory tradition," *Rahimi*, 602 U.S. at 692, and "analogous enough" to founding-era restrictions "to pass constitutional muster." *Bruen*, 597 U.S. at 30. Accordingly, we hold that PS § 5-133(d) is constitutional as applied to individuals who are 18 to 20 years of age, and the circuit court erred in dismissing the charges against appellee based on violations of that statute.

## IV.

## CR § 4-203

The State contends that the circuit court also erred in dismissing the two counts charging violations of CR § 4-203. At the time of the offense in this case, CR § 4-203 provided, in relevant part, as follows:

> (a) *Prohibited.* − (1) **Except as provided in subsection (b) of this section, a person may not:**
>
> > (i) **wear, carry, or transport a handgun, whether concealed or open, on or about the person;**
> >
> > (ii) **wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;**
> >
> > (iii) violate item (i) or (ii) of this paragraph while on public school property in the State;

(iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person; or

(v) **violate item (i) or (ii) of this paragraph with a handgun loaded with ammunition**.

(2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.

(b) *Exceptions* − This section does not prohibit:

(1) the wearing, carrying, or transporting of a handgun by a person who is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:

(i) a law enforcement official of the United States, the State, or a county or city of the State;

(ii) a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;

(iii) a law enforcement official of another state or subdivision of another state temporarily in this State on official business;

(iv) a correctional officer or warden of a correctional facility in the State;

(v) a sheriff or full-time assistant or deputy sheriff of the State; or

(vi) a temporary or part-time sheriff's deputy;

**(2) the wearing, carrying, or transporting of a handgun, in compliance with any limitations imposed under § 5-307 of the Public Safety Article, by a person to whom a permit to wear, carry, or transport the**

**handgun has been issued under Title 5, Subtitle 3 of
the Public Safety Article[.]**

(Emphasis added).

At the time of the offenses, Md. Code Ann., Pub. Safety ("PS") § 5-307 (2022 Repl. Vol.) provided:

> (a) A permit is valid for each handgun legally in the possession of the person to whom the permit is issued.
>
> (b) The Secretary may limit the geographic area, circumstances, or times of the day, week, month, or year in which a permit is effective.[10]

Appellee contends that the circuit court properly dismissed the charges against him because CR § 4-203 was, at the time he was charged, facially unconstitutional and unconstitutional as applied to him. He argues that, at that time, CR § 4-203 "hinged on the may-issue licensing scheme" in PS § 5-306, which *Bruen* found to be unconstitutional, and because he was convicted for exercising his constitutional Second Amendment right

---

[10] In 2023, PS § 5-307(b) was amended to provide that a permit issued would be restricted "to wearing, carrying, or transporting a handgun concealed from view," with a provision that this requirement is not violated by "the momentary and inadvertent exposure" of a handgun or the imprint or outline of a handgun. 2023 Md. Laws, Ch. 680 (S.B. 1).

pursuant to an unconstitutional statutory scheme, the circuit court properly granted his motion to dismiss.[11]

At the time of appellee's charges, in 2019, PS § 5-306(a)(6)(ii) (2022 Repl. Vol.) provided:

> [T]he Secretary [of the Maryland State Police] shall issue a permit within a reasonable time to a person who the Secretary finds . . . based on an investigation[,] . . . **has good and substantial reason to wear, carry, or transport a handgun**, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.

(Emphasis added).

The State, conceded, as it must, that the GSR requirement was unconstitutional under *Bruen*. *See In re Rounds*, 255 Md. App. at 212 (the "good and substantial reason" requirement of PS § 5-306(a)(6)(ii) is unconstitutional). It argues, however, that appellee could still be prosecuted under CR § 4-203 for two reasons. First, the State asserts that appellee lacked standing to challenge CR § 4-203 because he did not offer any evidence that he applied for a permit or that doing so would have been futile. Second it argues that,

---

[11] Appellee additionally argues that Md. Code Ann., Crim. Law ("CR") § 4-203 (2021 Repl. Vol.) was unconstitutional (1) on its face because "there is no historical tradition of prohibiting all public carrying/transporting without a license," and (2) as applied to him because there was no finding that he was "a violent or dangerous person." As the State notes in its reply brief, appellee's argument below focused on the "good and substantial reason" language contained in PS § 5-306 at the time of his arrest. He did not raise below these other arguments with respect to CR § 4-203. Accordingly, those issues are not preserved for review, and we will not consider them. *See* Md. Rule 8-131(a) (an appellate court generally will not decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court"); *Leo v. State*, 268 Md. App. 63, 99 (2025) (declining to address the merits of appellee's contention when the issue was not raised in, or decided by, the circuit court).

even if appellee had standing to challenge the constitutionality of CR § 4-203, the "good and substantial reason" language that was invalidated by *Bruen* is severable, and once that language is severed, the permit qualification statute "thus remains . . . and so does CR § 4-203's prohibition against the unlicensed public carrying of handguns."

The standing issue is an interesting one. As the State notes, appellant never applied for a permit or showed that doing so would have been futile, based on age or a failure to have a good and substantial reason for a gun.[12] Nevertheless, for purposes of this opinion, we will assume, without deciding, that appellee has standing to challenge his conviction. We focus instead on the State's severability argument.

The Supreme Court of Maryland recently discussed severability, noting that there is "a strong presumption 'that a legislative body generally intends its enactments to be severed if possible.'" *Engage Armament LLC v. Montgomery Cnty.*, ___ Md. ___, ___, 2026 WL 1144313, at *18 (Md. Apr. 28, 2026) (quoting *Sugarloaf Citizens Ass'n. v. Gudis*, 319 Md. 558, 574 (1990)). The Court stated that "[t]he test to determine whether a provision is severable is if a legislative body would 'have enacted the statute or ordinance if it knew that part of the enactment was invalid[.]'" *Id.* (quoting *Cnty. Council of Prince George's Cnty. v. Chancey Enters.*, 454 Md. 514, 540 (2017)). "When the dominant purpose of an enactment may largely be carried out notwithstanding [its] partial invalidity,

---

[12] In 2019, Md. Code Ann., Pub. Safety ("PS") § 5-306 limited licensure to "adult" applicants. At that time, adult was defined as "an individual at least 18 years old." Md. Code Ann., Gen. Provisions ("GP") § 1-103 (2019 Repl. Vol.). In 2023, PS § 5-306 was amended to require, with exceptions, a permit holder to be "at least 21 years old." 2023 Md. Laws, Ch. 651 § 1 (H.B. 824).

courts will generally hold the valid portions severable and enforce them." *Id.* (quoting

*O.C. Taxpayers for Equal Rts. v. Mayor of Ocean City*, 280 Md. 585, 600 (1977)). *Accord*

*Balt. City Bd. of Elections v. Mayor of Balt.,* 489 Md. 465, 511 (2025).

Here, the legislative intent regarding severability is clear. In 2014, the General

Assembly enacted legislation providing as follows:

> (a) *In general.* — Except as otherwise provided, the provisions of all statutes enacted after July 1, 1973, are severable.

> (b) *When part of statute found to be unconstitutional or void.* — The finding by a court that part of a statute is unconstitutional, or void does not affect the validity of the remaining portions of the statute, unless the court finds that the remaining valid provisions alone are incomplete and incapable of being executed in accordance with the legislative intent.

Md. Code Ann., Gen. Provisions ("GP") § 1-210 (2019 Repl. Vol.).

PS § 5-306(a)(6)(ii) was first enacted in 1972, *see* 1972 Md. Laws Ch. 13, and it

was codified in Md. Ann. Code, art. 27 § 36E(a)(6). *See State v. Crawford*, 308 Md. 683,

694, 695 n.5 (1987). The statute was repealed and re-enacted without substantial revisions

on October 1, 2003. 2003 Md. Laws, Ch. 5, §§ 1 & 2. The General Assembly, therefore,

intended that the revised and re-enacted provisions, including the "good and substantial

reason" requirement, be severable.

Moreover, after *Bruen* invalidated the "good and substantial reason" requirement,

s*ee In re Rounds*, 255 Md. App. at 212, the General Assembly repealed this provision. 2023

Md. Laws, Ch. 651, § 1 (H.B. 824). The legislature, however, left the remaining provisions

of PS § 5-306 as they existed at the time of appellee's arrest. *Id.* These provisions required

that individuals seeking a permit to publicly carry a handgun must demonstrate, among other things, that they had not been convicted of any disqualifying crimes, *id.* § 5-306(a)(2)-(3); had completed certain firearms training courses, *id.* § 5-306(a)(5); and had not exhibited a propensity for violence that might render their possession of a firearm dangerous to themselves and others, *id.* § 5-306(a)(6). After the GSR requirement was removed, the permitting scheme, as revised, was not "incomplete and incapable of being executed in accordance with the legislative intent." GP § 1-210(b). *See State v. Wade*, 301 A.3d 393, 511 (N.J. Super. Ct. App. Div. 2023) (the "justifiable need" provision of the New Jersey gun-carry permit statute was severable, leaving the remaining portions of the firearm permitting scheme constitutional and enforceable following *Bruen*), *superseded on other grounds by statute*, N.J. Stat. Ann. § 2C:58-4 (West 2022).

Accordingly, we hold that the invalid GSR provision was severable, leaving in place a permitting scheme that made appellee's conduct criminal. Appellee has not shown that CR § 4-203 was facially unconstitutional or unconstitutional as applied to appellee. The circuit court erred in dismissing the counts charging violations of CR § 4-203.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.**